IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Steve C. Barnes,

          Plaintiff,

          vs.                    Case No. 10-1280-JTM

Cessna Aircraft Co.,

          Defendant.


MEMORANDUM AND ORDER

Plaintiff Steve Barnes was terminated from his employment at Cessna Aircraft Company after he failed to successfully complete an employee performance improvement program. Barnes has brought the present action alleging that Cessna discriminated against him under Title VII, 42 U.S.C. § 2000e and the Kansas Act Against Discrimination, and that it retaliated against him after he brought administrative complaints against Cessna. Because Barnes has failed to present a prima facie case of discrimination or retaliation, because Cessna has established legitimate reasons for its actions, and because Barnes has failed to show that these reasons are a pretext for unlawful action, the court grants Cessna's Motion for Summary Judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary

judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The court makes no findings of fact which are not materially relevant or are not predicated on admissible evidence grounded on personal knowledge.

### Findings of Fact

Barnes, a 40 year old African American man, began working at Cessna on August 23, 1999, as a Grade 5 experimental mechanic in Cessna's Experimental Department, Department 179. Barnes had previously worked in the United States Air Force. He had also received his Federal Aviation Administration Airframe and Powerplant (A&P) license after

completing a course at the Wichita Area Technical College. Department 179 was divided between two separate hangars, hangars C-12 and W-2. From 2005 until his termination, Barnes primarily worked in hangar W-2.

Barnes was hired by Cessna's Human Resources Department. Barnes' supervisor for part of the time he worked on the 8th Shift, Bruce Woodruff, was not involved in hiring employees. Woodruff is also not involved in assigning employees their initial grade.

On February 28, 2000, Barnes transferred from the 6th shift to the 8th shift, which worked twelve-hour shifts on Friday, Saturday, and Sunday.

Beginning April 30, 2001, Barnes began reporting to 8th shift supervisor Woodruff. Woodruff reported to Tom Graham, the 8th shift General Supervisor. Graham reported to Art Taylor, Director of the Experimental Department.

In Department 179, Grade 3 experimental mechanics are higher grade mechanics than Grade 5 experimental mechanics. Grade 1 is the highest grade that an experimental mechanic can achieve.

Cody Littlestar, a Grade 1 Experimental Mechanic-A&P Lead, delegated work to Barnes beginning March 17, 2003. On May 28, 2007, another employee, Michael Jenkinson began to serve as an additional Grade 1 Experimental Mechanic-A&P Lead, delegating work to Barnes.

The 8th shift, as a weekend shift with a smaller staff and a limited number of supervisors, did not have many promotional opportunities. Between July 2002 and November 2007, there were only seven promotions of experimental mechanics from Grade 5 to Grade 3. Of those seven promotions, five occurred before Barnes filed his September 24, 2007 complaint. These promotions included Reza Samadian, Littlestar, Harry Marbun, Barry Daugherty, and Dominick Mariotti. When Barnes filed his complaint, the most recent promotion had occurred three years previously, in June 2004.

In Department 179, employee point ratings for experimental mechanics were conducted approximately every May and November. Due to a change in the timing of the evaluation process, no experimental mechanics were given evaluations in the first half of 2008.

Woodruff did not obtain input from other employees at the time he completed the score sheets for the experimental mechanics, but asked for input throughout the year. He inquired about how long it took for an employee to perform a task, whether an employee's quality of work was up to standard, and what was observed by Tom Graham.

Woodruff constantly communicated with his lead mechanics to find out what other employees were working on and what was occurring in the hangar. He was constantly attempting to obtain information regarding how things were progressing and making sure that work was being completed on time. He completed employee evaluations based primarily upon his own personal observations. He also used information received from other employees to corroborate what he saw. He talked to Graham as well as the department leads, Littlestar, Jenkinson, and Samadian. He also obtained information from leads in other departments, such as David Skaggs, Will Lehman, and David Ebers.

When conducting employee evaluations, Woodruff evaluated each employee's performance based upon conduct occurring while the employee worked at Cessna, without regard to the employee's prior work experience. As such, Woodruff's decision not to promote Barnes to the position of Grade 3 experimental mechanic was based upon Barnes' performance while at Cessna, without regard to Barnes' prior employment experience.

Woodruff ranked employees based on (1) job knowledge/degree of supervision; (2) job attitude; (3) cooperation; (4) use of time; attention to duties; (5) volume of work; (6) quality of work; (7) initiative/self motivation; (8) use of materials and supplies; (9) observance of safety rules; (10) housekeeping; and (11) self-development. Within each

category, employees could receive one of several categorical ratings, including Outstanding, Excellent, Above Average, Satisfactory, Provisional, and Unsatisfactory.

Cessna provided its supervisors with Experimental Performance Appraisal Definitions, which were standards to use when rating employees within each category. Woodruff used the Experimental Performance Appraisal Definitions to guide him in preparing employee evaluations. Woodruff did not use any other document to assist with evaluating the categories identified in the Employee Appraisal. Woodruff gave Barnes the following scores:

| | |
|---|---|
| June 2, 2001 | 287 |
| November 24, 2001 | 302 |
| May 5, 2002 | 302 |
| November 30, 2002 | 307 |
| April 26, 2003 | 323 |
| November 30, 2003 | 331 |
| May 22, 2004 | 339 |
| November 14, 2004 | 338 |
| May 15, 2005 | 330 |
| November 11, 2005 | 346 |
| May 28, 2006 | 345 |
| October 22, 2006 | 317 |
| May 25, 2007 | 299 |
| October 28, 2007 | 301 |

Barnes alleges that each of his employment reviews, beginning with his May 2002 review, are discriminatory. He believes his reviews should have been higher because he disagrees with Woodruff's opinion and assessment of his performance.

Barnes claims that his May 2002 review began to show Woodruff's discriminatory intent, but he acknowledged during his deposition that he just disagrees with Woodruff's evaluation, based on his opinion of his own performance. He therefore infers that Woodruff's difference of opinion is based upon his race.

Similarly, Barnes testified that he believes that his November 2002 review was discriminatory because, in his opinion, his performance deserved a higher rating. He testified that his each of his reviews from April 2003 to May 2006 are discriminatory

because he believes his score should have been higher, and he should have been promoted to the position of Grade 3 experimental mechanic on or around November 2002.

Barnes believes his October 2006 review is discriminatory because his school efforts, alleged assistance to other employees, prior experience, and lack of prior promotion made such a decision discriminatory. He believes his May 2007 review is discriminatory because of the amount of time he had been employed by Cessna, and his own belief that he should have been previously promoted to the level of Grade 3 experimental mechanic. He testified that his October 2007 review is discriminatory because Barnes should have been promoted to the level of Grade 3 experimental mechanic previously.

Barnes' reviews were progressing towards achieving an overall evaluation of 350 points, until he received a write-up from Cessna's Human Resources Department in April, 2005.

On May 27, 2005, Barnes met with Art Taylor, Tom Graham and Bruce Woodruff to discuss his frustration over not being promoted. Barnes reiterated that he thought he should have been promoted in June of 2004 when Harry Marbun had been promoted.

Between the May 2006 and October 2006 review, Barnes' ratings for "use of time," "attention to duties" and "volume of work" declined. Woodruff marked Barnes down in those areas because Barnes was not performing what was asked of him. By the time Woodruff completed Barnes' October 2006 review, Woodruff had already had a conversation with Barnes wherein Barnes had indicated that he was not going to do the work that was asked of him.

Between the October 2006 and May 2007 reviews, Woodruff additionally marked down Barnes' rating for "initiative/self motivation." Between Woodruff's October 2006 and May 2007 reviews, Woodruff continued to see a decline in Barnes' willingness to work, which in Woodruff's opinion justified Barnes' receipt of "satisfactory" ratings in various categories.

On Barnes' October 2007 review, Barnes was marked as "satisfactory" for his performance in "cooperation," "use of time," "attention to duties," and "initiative/self motivation."

Barnes has testified that discrimination must underlie his lack of promotion "[b]ecause I don't have any other explanation." He testified he should have been promoted to Grade 3 before another employee, Marbun, and that he should have been promoted after Marbun, as well. In addition, he believes he should have been promoted above Scott Melzer, Fred Kreiman, Daugherty, Littlestar, and Samadian.

Samadian and Littlestar were promoted to the position of Grade 3 experimental mechanic in July 2002. Marbun and Daugherty were promoted in June of 2004; Kreiman was not promoted until November 2007, and Melzer was not promoted until August 2008, after Barnes' employment was terminated.

From at least October 1, 1995 through October 9, 2007, Department 179 had a written policy applicable to promotions. Under this Promotional Policy, a promotion from Grade 5 to Grade 3 was not automatic, but required (1) cross-training in two or more disciplines and attendance at two or more leadership training courses; (2) the ability to perform all functions of the flight line in all models in running functional tests, phase inspections, and be qualified to taxi and run engines on all Cessna aircraft that were in the experimental department's inventory; (3) a score of 350 or more on his performance evaluation; and (4) the existence of an opening on the same shift.

From at least October 1, 1995 through October 9, 2007, promotions to Grade 3 depended on the needs of each shift. Thus, the mere fact that an existing Grade 3 engineer might leave the department did not by itself create an opening to be filled.

Under Woodruff's supervision, Barnes was never promoted to Grade 3. Woodruff did not believe Barnes deserved promotion because Barnes did not meet all the requirements, his overall performance did not warrant a promotion, and Barnes never

7

reached the minimum requirement of achieving a review with 350 points or more.  He did not consider Barnes' attendance of leadership classes or whether he was cross-trained on all aircraft.

Throughout the course of his employment, Barnes was disciplined for various matters, including violating the Electronic Communications Agreement, failing to report vacation properly, talking on his cell phone, being difficult to locate, and failing to write a removal or attach a removal tag to a tire and wheel assembly.

Woodruff received complaints from other shifts regarding the quality of Barnes' work. One complaint was that Barnes had done a poor job on the emergency brake bottle installation, left a pressure line uncapped and laying in the baggage compartment beneath the floorboards, and did not take notes during tie-in time. On another occasion, Woodruff received a report that Barnes signed off on a preflight as being complete without closing off all the APS items.

Barnes notes with respect to the uncapped pressure line that the employee making the report could not positively identify him as the culprit. It remains uncontroverted, however, that this employee had been told Barnes was the responsible party, and had duly reported this to Woodruff.

Woodruff received information from Jenkinson in April 2008 and again in August 2007 regarding Barnes' job performance. Jenkinson wrote down incidents where Jenkinson believed a deficiency in Barness performance occurred and reported that information to Woodruff.

Woodruff believed that each of the employees promoted above Barnes were qualified for the promotions that were given. At the time of each promotion, the employees had achieved the minimum number of points required for the promotion and Woodruff had not received complaints from other shifts or information from leads, managers, or

others indicating that any of the promoted employees made mistakes of similar seriousness to those made by Barnes before they were promoted.

Based upon his personal observations of the quality of each of the promoted employees' work and input from others that worked with the promoted employees, Woodruff believed that such employees were more qualified than Barnes for the position of Grade 3 experimental mechanic because they performed their work, assisted with the work of others, and had the mechanical aptitude to adequately perform the duties expected to be performed by a Grade 3 experimental mechanic.

Woodruff did not promote any employee from Grade 5 to Grade 3 who had not received a 350 point evaluation. More than one employee met the 350 minimum for more than one evaluation period before such employees were promoted.

In addition to Barnes, several Caucasian employees on the 8th shift under Woodruff were never promoted from Grade 5 to  Grade 3, including Anthony Hershberger, John Abram, James Babcock, Scott Baker, Lawrence Fanshier, Heath Fournier, Patrick Hamblin, Kenneth McKibben, Joel Mugglin, and Thomas Ohser. Woodruff did offer a promotion to Terrell Richardson, an African American employee. However, Richardson was trying to find a position elsewhere at Cessna to use the schooling he had obtained, and he left the division before the promotion went into effect.

On September 10, 2006, Barnes told Woodruff that he believed he was being subjected to discrimination. Barnes claimed that Woodruff told him to put his homework away, but did not tell other employees to put away their homework. During that meeting, Barnes said that he decided he was not going to do the work asked of him. Barnes did not state that he believed the discrimination was based upon his race, and Woodruff did not take Barnes' comments as a complaint of racial discrimination. Barnes did not report to Taylor, Woodruff, or Graham that he felt like the reason he was not receiving a promotion was because of his race.

Woodruff counseled employees on several occasions regarding putting away homework, taking long lunch breaks, and using cell phones at undesignated times. He engaged in such counseling to the experimental mechanics as a group during crew meetings, and addressed the problems, as needed, on an individual basis with employees that still engaged in improper conduct. Woodruff's informal reminders and verbal counseling to the employees did not rise to the level of formal verbal reprimands or formal discipline under Cessna's disciplinary action practices.

Barnes complains that he was counseled more closely than other employees, but he has no personal knowledge to support this claim. If a particular employee continued to engage in the conduct to the point that it needed to be formally addressed, Woodruff would address that employee in private in his office. Unless the employee being counseled told other employees about his discipline, other employees would not have knowledge that an issue had been addressed.

Barnes acknowledged that when Woodruff met with and counseled or disciplined him that no other coworkers were present in the office other than Graham. Barnes would not expect Woodruff to discipline him in front of others or to discipline others in front of Barnes.

Barnes understands that when a supervisor requests that he do something and he doesn't follow or violates those instructions, that his actions can be considered insubordination. Barnes acknowledged during his deposition that, when Woodruff asked him to do something and he responded that he would not perform that action or failed to perform the action, his conduct could be considered insubordination.

Barnes was formally disciplined on October 2007, on April 2008, and again on June 2008. The disciplines arose from unrelated matters, and were not cumulative. Thus, none of these instances of formal discipline is dependent upon another instance of formal discipline for the severity of the punishment imposed.

10

On or about July 31, 2007, after his performance score dropped to 299, Barnes submitted a written complaint to Don Tannahill, Cessna's HR Business Partner, Engineering. Among other things, Barnes complained that his points were improperly decreased, that he had been unfairly dealt with on several occasions, and that he was treated differently from other employees who engaged in what Barnes claimed were inappropriate activities.

Following receipt of Barnes' claim, Cessna reviewed Barnes' allegations and interviewed Barnes. Edwards also requested and reviewed information from Woodruff regarding treatment of Barnes and other employees on the 8th shift. On Sunday, August 5, 2007, Littlestar sent an email to Woodruff containing 16 different areas where he criticized Barnes. Woodruff asked him to provide him with any information about Barnes' deficiencies or any problems he had with Barnes. Woodruff later forwarded to Rogers a list of the discussions he had with Barnes.

On August 7, 2007, Rogers wrote to Brenda Edwards stating that "there is absolutely nothing I can see to support any claim of discrimination." He went on to say that "when you look at the notes you will see times he could have been disciplined and Woody chose to leave it alone. He should be saying thanks instead of claiming maltreatment."

On August 12, 2007, Jenkinson sent an email to Woodruff in which he was critical of Barnes knowledge or performance of three different tasks.

On August 17, 2007, Rogers and Brenda Edwards met with Barnes again. Rogers told Barnes they found no evidence of discrimination. He told Barnes "you're shooting yourself in the foot," and that "it is so obviously different what is real versus what you thought was real."

It is uncontroverted that, during this investigation, Barnes told Edwards and Galen Rogers that he thought his performance and commitment to the job had declined. In particular, Barnes agreed that he had "lost his fire for the job" when another employee, Marbun, had been promoted above him.

On or about September 24, 2007, Barnes filed a complaint with the Kansas Human Rights Commission, in which he alleged that his supervisors discriminated against him on the basis of his race by decreasing his performance points from July 2006 to at least July 2007, which he alleged prevented him from being promoted. No other allegations of discrimination were asserted in the complaint filed with the KHRC.

On or about October 12, 2007, Barnes was written up for taking the day off without notifying his supervisor and not entering his time into Cessna's computer program that tracked vacation hours. Woodruff believed that Barnes improperly reported his vacation by placing a form in a pile of paperwork on his desk on October 6, 2007. As a result, Woodruff did not find the vacation request until later, and he was unaware that Barnes had not reported to work until later in the shift.

On October 28, 2007, Woodruff evaluated Barnes as "excellent" in job attitude, quality of work and "self-development." He was not rated as below Satisfactory in any category of his evaluation.

Cessna's attendance policy for Department 179 required that all absences be reported to the employee's supervisor before the scheduled start time of the shift. To request vacation, an employee was required to fill out a green sheet. The employee could either give Woodruff the form personally, or leave it on his desk and then notify him.

Barnes alleges that he placed the vacation form on Woodruff's keyboard and told Littlestar about it. But Woodruff has stated that employees were to independently let him

— Woodruff, not some other employee — know if they had left something on his desk, and he had said so to Barnes. Barnes told him that he disagreed with that process.

It was reported to Woodruff that on November 9, 2007, Barnes went to C-12 and discussed his discrimination complaint with Littlestar and Dominic Caire.

Graham was informed that, in late March 2008, Barnes made comments at a "Point of Contact" meeting for the employees. During the meeting, Graham left so that the employees could select a "point of contact" person for their team. Barnes thereafter made a comment that the KHRC ruled in Barnes' favor in his discrimination lawsuit and that it would not be very long until Barnes received a very large retirement. Barnes denies making this comment, but it is uncontroverted that one of the plaintiff's co-workers reported to Graham that the plaintiff had announced a very large retirement based on his discrimination claim.

Rogers was informed of this comment, along with another reported comment by Barnes about holding a gun and being ready to pull the trigger. He and Edwards conducted an investigation into Barnes' conduct and interviewed several employees. They were told that Barnes had made statements regarding matters such as rebuilding the company, bringing the black man down, being a millionaire, and meeting with Jack Pelton (then CEO of Cessna) at IHOP.  When Barnes was interviewed regarding his statements, he denied the allegations. He also declined to clarify whether he had made negative comments regarding members of supervision. Barnes was told not to have any discussions with anyone at work about the matters discussed during the interview.

Barnes was told not to discuss the matters discussed during the interview as a matter of standard Cessna policy. Although Barnes could discuss the matters with leadership or a Human Resources representative, Rogers believed that discussing such

13

matters on the shop floor generally led to problems because it was disruptive to the work environment.

Skaggs made a report to Woodruff regarding a radio program to which Barnes was listening. Woodruff went to the shop floor to confirm whether or not there was graphic language being used on the program, but Woodruff did not overhear any graphic language. Woodruff also spoke with Martha Morales after learning that she complained of Barnes listening to sexually explicit radio programming.

On April 11, 2008, Graham met with Barnes and told him that he had been working well recently, but that he had been informed that Barnes was listening to a sexually explicit and offensive radio show. Barnes was informed that Morales had complained about the station. The complaint related to either the Tom Leykis Show or Love Line. Since Woodruff did not tell him which show to stop listening to, Barnes "picked one," and stopped listening to Love Line. Graham told Barnes not to listen to the program again at work, and that the program was offensive to others. Barnes claimed the program was acceptable because it was regulated by the FCC. He was not disciplined for listening to the radio program at this time.

On or about April 18, 2008, Barnes met with Taylor, Graham, Woodruff, and Rogers. During the meeting, Barnes was told not to have conversations at work regarding his race that were negative in nature, conversations supposedly had with Jack Pelton, or Barnes' case with the KHRC. Barnes was told to come to work, focus on the job, and avoid conversations relating to the identified topics. The focus of the April 18, 2008 meeting was not to issue discipline, but was more in the nature of warning Barnes not to engage in such discussions, regardless of whether he had engaged in those discussions in the past.

14

A little over a week later, Littlestar told Woodruff that Barnes had made comments, including "never underestimate a brotha" and "don't worry will be a black ops," which Woodruff believed could be offensive. The same day, Skaggs told Woodruff that he walked by Barnes' work area and heard sexually explicit material on his radio. Skaggs reported to Graham and Woodruff that he noticed Barnes had his radio on and was listening to Tom Leykis. According to Skaggs, the show was reading listener emails about a previous radio show topic and were discussing "rolling fat people in flour to find wet spots," how they didn't know how "anyone would want that pussy," and about "butt fucking" it.

Barnes denies that these comments were made on the radio show, but it is uncontroverted that Skaggs made this report to Woodruff.

Barnes was called to the office and written up for listening to those types of programs because he had been previously warned not to listen to. When Barnes arrived at the meeting he had a tape recorder in his pocket and was told multiple times to turn it off, pursuant to Cessna's Plant Rules, which prohibit the use of such devices. Barnes refused to turn off the tape recorder.

Barnes was given a copy of the write-up and asked to read it. He was asked if he was listening to KFH, and he stated that he had listened to it since 6:00 that evening. Barnes was reminded that he was not to listen to sexually explicit or offensive material. Barnes said he was going to continue to listen to the station, and asked for a copy of the write-up. Barnes was told that he could not have a copy but could look at it in his personnel file.

Barnes then stood up and started to leave with the write-up. It is uncontroverted that, after Woodruff told him that he was not leaving with the document, Barnes said, "Oh yes I am," and left the office to make a copy of the write-up to take with him. Woodruff called security and informed them that Woodruff had an employee that needed to be

escorted out. As Barnes was leaving, Woodruff told Barnes he would be contacted by Cessna's Human Resources Department during the next week.

Barnes acknowledged in his deposition that he had a recording device during the meeting, that he was asked to turn off the recording device but refused to do so, that Cessna has a policy that recording devices are not allowed on the premises, and that, despite this he told Woodruff and Graham he would not comply with their request to turn off the recorder. He further acknowledges that Woodruff had previously told Barnes not to listen to that particular radio station, but that he had continued to listen to it. Barnes also acknowledged that Woodruff had explained that another employee had complained about the content of the radio station and that, despite Woodruff telling Barnes not to listen to the station, Barnes listened to it anyway. Barnes also understood his conduct to be insubordination for not following Barnes' supervisor's instructions.

Barnes claims that another employee was allowed to listened to Howard Stern, but the evidence shows that Woodruff was unaware of any employees that listened to Howard Stern without using headphones. Moreover, Barnes has not submitted any evidence that Cessna managers had received complaints of other employees listening to sexually explicit radio shows without imposing private counseling.

It was Cessna's common practice to not let an employee have a copy of their discipline. An employee could review the discipline and made notes regarding the same, but could not have a copy of the discipline.

On April 28, 2008, Human Resources called Barnes to inform him that, based upon the documented occurrences from April 27, 2008, he was being suspended for three days. Barnes was advised that any act of insubordination after his return to work would result in immediate termination. The next day, Cessna sent Barnes a letter stating that he had

16

exhibited insubordinate conduct in the workplace and that the behavior must be corrected immediately and permanently. The letter reminded Barnes that he was expected to follow instructions from his management team, refrain from making comments in reference to race, not play inappropriate or sexually explicit radio stations, and not bring any recording devices into the facility. Barnes was also cautioned that any further incidents of insubordination would result in his termination.

On May 7, 2008, Rogers and Jennifer Grindstaff from Employee Relations called Barnes to discuss the suspension. Barnes was told that the root reason for the reprimand was because Barnes went further than listening to the radio program and took it upon himself to copy the document in the manner that he did. Additionally, Barnes indicated that he was taping the conversation, which was a violation of Cessna's Plant Rules. Barnes was told that, going forward, if Barnes' conduct continued he was putting his job at risk.

On May 11, 2008, Woodruff provided Tannahill and Edwards a statement concerning what Woodruff considered to be Barnes' sub-par work performance that weekend, and the efforts undertaken by other employees to correct Barnes' work. Woodruff believed it seemed as though everything Barnes was doing was "carefully planned out to make [Woodruff's] job as well as [Barnes'] co-workers [sic] jobs difficult."

On May 16, 2008, after consultation with Cessna's Employee Relations Department and Legal Department, Barnes was placed on a PIP to address performance issues. The decision to place Barnes on a performance improvement program or plan (PIP) was made by Tannahill in consultation with Cindy Poulson from Employee Relations, with oversight from Cessna's Legal Department.

Tannahill prepared a draft PIP with oversight from Poulson and input from Woodruff. The PIP upon which Barnes was eventually placed set forth several goals relating to quality of work, communication, and time management.

Barnes, Grindstaff, Woodruff, and Graham were present at the meeting to issue the PIP. Barnes was told during the meeting that he was expected to improve in the identified areas or his employment could be terminated. Barnes confirmed that the expectations were achievable and was told and agreed not to discuss the PIP with coworkers.

Before the PIP was initiated, Tanahill told Woodruff and Rogers that Woodruff needed to meet with Barnes every week during the PIP to discuss progress or lack thereof. The PIP document provided reiterates that supervisors would meet with him every week for the next 60 days and then monthly for an indefinite period of time.

Cessna has adopted a policy pertaining to the use of PIPs for its employees. Pursuant to this policy, a PIP is "used for employees experiencing difficulty achieving planned results against [o]bjectives, either because they are not meeting performance expectations or are only partially meeting performance expectations." Generally, a PIP is not recommended to exceed three months. Before placing an employee upon a PIP, a supervisor must obtain approval and input from Cessna's Human Resources department. Under the policy, "a 90-day PIP does not guarantee employment through the end of the 90 days. If a person's performance is not improving, or even worsening, termination of employment may be exercised at any time during the PIP." The purpose of the PIP is to assist the employee with achieving a more productive work environment, is remedial, and aimed at improvement rather than punishment or discipline, although this may be the ultimate result.

Woodruff assessed Barnes' performance under the PIP, and reviewed this performance with Barnes about every other week. Woodruff made notes concerning his observations of Barnes on 43 occasions.

For the weeks beginning May 16 and ending June 1, Barnes was considered by Woodruff to have had satisfactory performance. His performance was not evaluated as either satisfactory or unsatisfactory for the week of June 6 through June 8, 2008.

For the week of June 13, 2008 through June 15, 2008, Woodruff considered Barnes' performance under his PIP to be unsatisfactory because Barnes did not sign off on any work for that week. Barnes did not sell any removals that weekend, and took a vacation day on Sunday.

Woodruff also found Barnes work performance unsatisfactory the next week. He based this on his observations, experience, and perceived performance of other employees, and that Barnes performed only 15 hours worth of work in a 36 hour week.

Woodruff recorded Barnes' performance as satisfactory for the week of June 27 to 29, 2008, and the one day he worked during the week of July 4, 2008.

However, Woodruff concluded that Barnes' performance for the week of July 11 to 13, 2008 was again unsatisfactory. Based upon his observations, experience, and perceived performance of other employees, Woodruff found that Barnes had completed only 12 hours worth of work in a 36 hour week.

Barnes' work performance was not evaluated as either satisfactory or unsatisfactory for the week of July 18 to 20, 2008.

On May 30, 2008, Barnes filed a second KHRC complaint, alleging that he was subjected to retaliation. Barnes did not assert a claim of discrimination based upon the allegations contained in the complaint. He claimed he was subjected to retaliation between

19

February 2008 to "at least" March 2008 because he had his work assignments given to other employees without being assigned new work and denied training. He also claimed to have been reprimanded for making "inappropriate remarks" to other employees concerning his prior complaint of discrimination. Finally, Barnes asserted that he received a written reprimand on April 29, 2008 for allegedly listening to an offensive radio talk show.

Woodruff was informed that the next day, Barnes had gone to another work area where Jenkinson was working and showed Jenkinson, Caire, and Jim Underwood information about his "lawsuit." In his Response, Barnes denies actually making these comments, but it is again uncontroverted that other co-workers reported these comments to Cessna supervisors.

Barnes' reported actions violate Cessna's Productive Work Environment Policy, which provides that "[i]t is the policy of Cessna Aircraft Company to promote a productive work environment and not to tolerate verbal or physical conduct by any team member/contractor which harasses, disrupts, or interferes with another's work performance or which creates an intimidating, offensive or hostile environment." The policy applies to both team members and supervisors and requires employees to maintain a productive work environment. The policy also imposes an obligation upon employees to report or complain about the situation as soon as possible and cooperate in any investigation. The policy prohibits retaliation for filing a complaint or participating in an investigation related to the policy.

On June 6, 2008, Barnes, Woodruff, Graham, and Rogers met in Tannahill's office to give Barnes a disciplinary memorandum for violating Cessna's Productive Work Environment policy. Barnes had been previously counseled regarding making comments about his litigation with Cessna, but was reported to have spoken with multiple employees

regarding his complaint against Cessna. Barnes was suspended without pay for 36 work hours beginning June 6, 2008. Barnes acknowledged during his deposition that he had been advised by someone in Cessna's Human Resources Department not to discuss any complaints he had at Cessna with coworkers.

Barnes' employment was terminated effective July 25, 2008, for not successfully completing the Performance Improvement Process. During a meeting with Woodruff, Tannahill, Rogers and Barnes, Barnes was told that based on his inability to sustain the expectations in his PIP that his employment was terminated effective July 25, 2008.

The decision to terminate Barnes' employment was made by Tannahill in consultation with Poulson and oversight by Cessna's Legal Department. Rogers was not involved in the decision to terminate Barnes' employment.

Barnes believes his termination was retaliation because Woodruff was the individual about whom he had complained and, he alleges, Woodruff was involved in his termination.

On July 28, 2008, Barnes amended his retaliation KHRC complaint. As with his original retaliation complaint, the amended complaint asserted only a claim for retaliation, and not for discrimination.

In his Response, Barnes cites evidence showing positive performance at Cessna, including his training of other employees such as Harry Marbun, Scott Melzer and Terrell Richardson. He notes that he served as a crew chief and was in charge of several aircraft, including XL, XL Plus, Mustang Proto and possibly Citation X. In particular, he presents the affidavits or deposition testimony of several co-workers, who generally state that Barnes was a cooperative and helpful worker and a good or pretty good mechanic, including Patrick Hamblin, Charles Nee Dels, Terrell Richardson, and Kerry Clinkenbeard.

Other than noting that these workers did not consistently work alongside Barnes throughout his employment, Cessna does not controvert their testimony.

In addition, Barnes states that he obtained at least 5 awards, but these awards seem to have either been received before 2005 (when Barnes began to have performance issues at Cessna), or was not an individual award but an award to a group of whom Barnes was one member.

Barnes also complains about the promotion of other mechanics, including Cody Littlestar, Reza Samadian, Harry Marbun, Barry Daugherty, Michael Jenkinson, Dominick Mariotti, Darrell James, Michael Jenkinson, Charles Black, Joseph Melzer, and Fred Kreiman. But each of these complaints is based solely upon the length of employment. In no instance does Barnes present any evidence, grounded on personal knowledge, as to the qualifications of the promoted employees, or how they met each of the four specific standards set forth in the promotion policy of Department 179. It is uncontroverted that policy was not one which automatically promoted based on length of service.

Similarly, Barnes presents the testimony of co-workers that they did not see Woodruff discipline other employees who engaged in behavior to Barnes, such as using a cell phone during a shift. But the uncontroverted evidence is that it was Woodruff's policy not to issue warnings or verbal reprimands in public, but to do so privately, as he did with Barnes. Again, Barnes submits no admissible evidence that similarly situated workers were in fact treated differently by Cessna.

Barnes also offers his subjective impressions in support of his claims. He thinks that his co-workers Littlestar and Skaggs made up and reported false information about him to Graham and Woodruff. He states that Graham ignored him and didn't speak with him very much. And he states that Woodruff monitored him closely and nitpicked his work.

22

***Exhaustion of Administrative Remedies***

Cessna first argues that court is without jurisdiction to hear most of the plaintiff's discrimination claims, as he failed to present these claims for administrative review. *See McDonald-Cuba v. Santa Fe Protective Services*, 644 F.3d 1096, 1101 (10th Cir. 2011) (Title VII litigation requires prior exhaustion of administrative remedies). Specifically, Cessna argues that Barnes' administrative claims focuses almost exclusively on his claims of retaliation. The only exception, it notes was his claim that Cessna discriminated against him by reducing his evaluation scores. In addition, Cessna argues that the administrative complaints are restricted in their allegations as to retaliation, stating in the first complaint that Cessna retaliated by not giving Barnes computer training, removing work assignments, and reprimanding him for listening to an offensive radio show. Barnes later amended the administrative charge to include the claim that Cessna retaliated against him by reprimanding him for discussing his EEOC charge with co-workers, being placed on a PIP, reprimanding and suspending him in June 2008, and terminating his employment. Barnes made no reference in the administrative complaint that he was retaliated against in other ways, such as his claim that Cessna punished him for improperly reporting his vacation, or giving him additional duties.

Barnes argues that Cessna has waived any exhaustion argument by failing to advance it in the Pretrial Order. He also argues that his claims were exhausted because the administrative complaints could be reasonably expected to include all the claims he brings in this action, citing *Jones v. UPS, Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007).

The court finds that Cessna has not waived the issue. In the Pretrial Order, Cessna explicitly stated that "Plaintiff has failed to exhaust his administrative remedies for many of his allegations and claims." (Dkt. 65, at 8).

23

However, the court finds that the plaintiff's administrative complaint effectively raised the issue of his lack of promotion, and that accordingly this claim is properly before the court. In his administrative charge, Barnes alleged that he was "subjected to a decrease in points which prevented me from being promoted." While this places the primary focus of the charge on the reduction in points, it also references the resulting loss of a promotion, and the investigating agency may be reasonably expected to investigate that allegation as well.

The court finds that the plaintiff has exhausted his administrative remedies as to the alleged discriminatory reduction of evaluation points and the refusal to promote. The court also finds that plaintiff has exhausted his administrative remedies for those discrete acts of retaliation mentioned in his administrative charges. The plaintiff, however, has not responded to Cessna's argument that the court is without jurisdiction to hear his claims as to any other acts of alleged retaliation, and the court finds that plaintiff has failed to exhaust his remedies as to such other acts.

### *Statute of Limitations*

The relevant statute of limitations precludes any claims (under Title VII) for events occurring before November 28, 2006, or (under the KAAD) before March 24, 2007. See 42 U.S.C. § 2000e-5(e)(1); K.S.A. 44-1005. As a result, the evaluations which occurred in May 25, 2007 and October 28, 2007 are actionable. However, acts of alleged retaliation occurring before the respective limitations deadlines, including Barnes' claims of an unfair reduction in his points, are time-barred.

Further, Barnes' failure-to-promote claim is time-barred. It is uncontroverted that the last Grade 3 vacancy in the department occurred in 2004. Even though some Grade 3

mechanics left the department, it is uncontroverted that such transfers or departures did not automatically create a vacancy under Cessna's policies. Rather, each department determined the existence of an open position based on current departmental needs. The plaintiff has supplied no evidence that after 2004, there was an eighth-shift Grade 3 position in Department 179 which Cessna tried to fill.

### Discrimination

For those claims which are properly before the court, Cessna argues that Barnes has failed to show a prima facie case of discrimination. *See McDonnell-Dougla Corp. v. Green*, 411 U.S. 792 (1973) (setting forth burden-shifting framework); *Crowe v. ADT Sec. Serv.*, 649 F.3d 1189, 1195 (10th Cir. 2011). Cessna argues that Barnes was not subjected to any adverse employment actions, that he has failed to show he was qualified to be a Grade 3 mechanic, and that there are no circumstances otherwise creating an inference of discrimination. In addition, Cessna argues that it had a legitimate, non-discriminatory reason for its actions, and that Barnes has failed to show that this was a pretext for discrimination.

Cessna argues that the allegedly discriminatory reductions in evaluation scores cannot be adverse employment actions, because Barnes was not otherwise qualified to be a Grade 3 mechanic. Adverse employment actions are those which reflect "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005).

But, of the standards for Grade 3 mechanics, the only one cited by Cessna in support of its argument that Barnes was not qualified for the position was his failure to achieve an evaluation score of 350 or more. Cessna correctly notes that the evidence shows that Barnes

never received a core of 350, even prior to the alleged discrimination by Woodruff. But, since Cessna's argument that Barnes was unqualified rests solely on his low evaluation scores, the court finds that these might constitute adverse employment actions.

The flaw with Barnes' discriminatory failure-to-promote claim is not that the low evaluations cannot theoretically constitute an adverse employment action, but that there is no evidentiary support for the claim that the evaluation scores were inaccurate, other than Barnes' own subjective belief as to the score he ought to have received. Barnes has failed to present admissible evidence, based on personal knowledge, showing how employees were evaluated in Department 179. *See Jones v. Denver Post Corp.*, 203 F.3d 748, 754 (10th Cir. 2000).

"It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance." *Furr v. Seagate Tech. Inc.*, 82 F.3d 980, 988 (10th Cir.1996). Because the plaintiff has failed to produce admissible evidence showing that the evaluation scores were the product of discriminatory animus rather than Woodruff's professional judgment, his claim of discrimination has failed to present an inference of discrimination.

Further, Cessna has presented legitimate reasons for its treatment of the plaintiff, based on Woodruff's evaluations and his belief that other candidates had better records in the work and mechanical aptitude. Although Barnes complains that he was unfairly singled out by Woodruff for evaluation and monitoring, he has failed to present any evidence showing that Woodruff ignored reported misconduct by similarly situated employees. Here, the evidence is uncontroverted that Barnes had achieved a consistent string of substandard evaluation scores, and (whether accurately or not) he had been reported as failing to perform requested work in a timely fashion as well as engaging in other actions

contrary to Cessna policies. Barnes has failed to present admissible evidence that Cessna's concerns were a pretext for discrimination.

An ostensible reason for an adverse employment action may be found to be pretext if the rationale is sufficiently implausible, inconsistent, or contradictory that a reasonable fact finder could rationally find it not credible. *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007). Again, however, proof of pretext must rest on more than the employee's subjective belief that the proffered reason is pretextual. *See Santana v. City and County of Denver*, 488 F.3d 860, 864 (10th Cir. 2007). Barnes has failed to show that Cessna promoted markedly inferior candidates, or that Cessna should have used some alternative standard for promotion, such as one tied solely to length of employment. To the contrary, the evidence establishes that Woodruff promoted candidates with superior test scores, in a manner consistent with Cessna's established procedures.

The defendant's actions were consistent with its internal policies and based on criteria which were applied to all similarly-situated employees. Cessna investigated reports of misconduct by Barnes, and there is no evidence that it failed to investigate reports of misconduct by other employees. There is no evidence that the investigation was a mask for discrimination rather than a good faith effort to apply company personnel policies, and no evidence that the investigation itself resulted in a material change in adverse employment action. The evidence shows that the plaintiff never met the minimum evaluation scores for promotion under any supervisor. The court's role is not to review the defendant's personnel decisions independently, substituting its own criteria, or those suggested by plaintiff, for promotion, but to determine whether the defendant applied its own criteria honestly. *See Santana*, 488 F.3d at 865, *Sanchez v. Philip Morris*, 992 F.2d 244, 247 (10th Cir.

1993) ("courts are not in the position of determining whether a business decision was good or bad").

> We do not ask whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them. Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision. Thus, we consider the facts as they appeared to the person making the decision, and we do not second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment. The reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a super personnel department, second guessing employers' honestly held (even if erroneous) business judgments.

*Riggs v. AirTran Airways*, 497 F.3d 1108, 1118–19 (10th Cir.2007) (citations and internal quotations omitted). The court finds that the plaintiff has failed to show that Cessna's proffered reasons for its actions are pretextual, and the defendant is entitled to the relief sought.

### *Retaliation*

Similarly, the plaintiff has failed to present a prima facie case for most of the instances of retaliation cited in his Complaint. Barnes claims that Cessna retaliated against him in a number of ways after he filed his administrative claims in September 2007 and May 2008. Specifically, he alleges that Cessna retaliated by denying him training, imposing additional duties, issuing reprimands and suspensions, monitoring him excessively, advancing false charges of misconduct, and ultimately terminating him.

A claim of unlawful retaliation under Title VII requires proof that the employer imposed a materially adverse condition on the plaintiff. *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009). An action is materially adverse if it is sufficiently harmful to the

point that it could dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006).

The court finds that the plaintiff has failed to present a prima facie case with respect to his claims relating to "excessive monitoring," false charges, additional duties, denial of training, verbal reprimands, or placement on the PIP. There is no evidence that any of these actions materially affected Barnes's pay or responsibilities. Barnes agreed that the goals of the PIP were achievable, and the evidence establishes that the PIP was remedial in nature rather than punitive. *See Davis v. Time Warner Cable*, 651 F.3d 664, 677 (7th Cir. 2011) ("[p]erformance improvement plans, particularly minimally onerous ones like that here, are not, without more, adverse employment actions").

The informal  reprimands issued to Barnes had no impact on his job position; the formal reprimands were independent rather than cumulative, and also did not materially alter his work duties. The evidence fails to show that the alleged denial of training played any role in increasing his job duties or otherwise materially affecting his position. Barnes has pointed to no specific duties which were given him which were not already within the scope of his position, and has not shown that the allegedly false charges of misconduct or the resulting monitoring materially affected his ability to do his job.

Barnes's other claims of retaliation such as his suspension do reflect materially adverse job actions, but no prima facie case exists as to these claims because the evidence fails to support any inference of causal connection between the protected activity and the adverse actions. *See Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999) (causation element of retaliation claim may be inferred by close temporal connection). Here, Barnes was suspended, with a consequent loss in pay, in April of 2008. This was nearly nine months after his then most recent administrative charge. Generally, an inference of

causation may arise when an adverse job action occurs within 90 days of the protected activity, while no such inference arises from where a delay of three months intervenes between protected activity and adverse job action. *Id*. at 1179 (comparing cases). The court finds, under the circumstances of the case, that plaintiff has failed to show the existence of a causal connection between any protected conduct and the April, 2008 reprimand over the radio station, placing Barnes on the PIP in May, 2008, or ultimately terminating him in July, 2008.

The only putatively retaliatory acts which succeeded closely after an administrative charge are the October, 2007 reprimand for not following department practice for the vacation request, and the June, 2008 reprimand for discussing his KHRC complaint.

The defendant, however, is entitled to summary judgment as to these and all of plaintiff's other claimed retaliatory acts, because it has proffered a legitimate rationale for its actions in reviewing Barnes' job performance. The uncontroverted facts establish that Woodruff believed that Barnes had failed to follow department policy in reporting a vacation request (by leaving a form on his desk and then orally informing another co-worker rather than directly speaking to Woodruff). The same facts show Woodruff had received reports that Barnes, despite prior warnings, had discussed his administrative complaints with co-workers, and a complaint that, again despite a prior warning, Barnes continued to listen to a radio program discussing sexual matters. When Woodruff and Graham spoke with Barnes, he refused to comply with their directions not to listen to the radio station, to stop recording the conversation, and not to leave the office with a copy of the write-up about the matter. These were legitimate grounds for the defendant to impose restrictions on the plaintiff.

30

Barnes complains that he was subjected to "excessive" monitoring, but there is no evidence that Cessna's investigation and monitoring of Barnes was not prompted by his job performance and uncontroverted insubordination, or they actually interfered with this job duties. Similarly, Cessna had a legitimate rationale for placing Barnes on the PIP and ultimately determining that he had failed to meet the goals set forth in that plan.

Finally, Barnes has failed to show that Cessna's proffered reasons for the investigation, PIP, or ultimate termination are a pretext for discrimination. It is uncontroverted that Cessna terminated Barnes after he failed to complete the PIP successfully. Barnes has not provided any evidence that Cessna knew other employees engaged in similar misconduct and failed to discipline them, that the complaints about his behavior were false and that Cessna knew them to be false, or that it believed he had in fact met the PIP standards. *See Bittell v. Pfizer, Inc.*, 307 Fed. Appx. 132, 139-40 (10th Cir. 2009) ("the proper inquiry is whether Pfizer honestly believed Bittel had violated its policy and acted in good faith upon that belief").

IT IS ACCORDINGLY ORDERED this 22nd day of December, 2011, that the defendant's Motion for Summary Judgment (Dkt. 63) is hereby granted.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

31